IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | |
|---|---|
| TEARA CODY, | : |
| Plaintiff, | : |
| v. | : CASE NO.: 1:20-CV-185 (LAG) |
| MILLERCOORS, LLC, | : |
| Defendant. | : |

# ORDER

Before the Court is Defendant MillerCoors, LLC's[1] Motion for Summary Judgment. (Doc. 25). For the reasons stated below, the Motion for Summary Judgment is **GRANTED**.

## PROCEDURAL BACKGROUND

Plaintiff Teara Cody initiated this action against Defendant, her former employer, on September 24, 2020, raising race-discrimination and retaliation claims under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. (Doc. 1). Defendant filed the present Motion for Summary Judgment on January 5, 2022. (Doc. 25). Plaintiff responded and Defendant replied. (Docs. 27, 31). The Motion for Summary Judgment is now ripe for review. *See* M.D. Ga. L.R. 7.3.1(A).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where "the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir.

---

[1] In January 2020, after the relevant events leading to this action, MillerCoors LLC became Molson Coors Beverage Company. (*See* Doc. 5 at 1).

2000) (en banc) (citation omitted). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1311 (11th Cir. 2018) (quoting *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004)). At summary judgment, the Court views the evidence "in the light most favorable to the non-moving party" and resolves factual disputes for the nonmoving party when doing so is supported by sufficient evidence. *Gogel*, 967 F.3d at 1134 (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (per curiam)); *Whitehead v. BBVA Compass Bank*, 979 F.3d 1327, 1328 (11th Cir. 2020).

      The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018); *Whitehead*, 979 F.3d at 1328. The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (per curiam). If the movant meets their initial burden, the nonmoving party must demonstrate that there is a genuine dispute for trial. *Gogel*, 967 F.3d at 1134 (citing *Celotex Corp.*, 447 U.S. at 324). The nonmovant must "go beyond the pleadings and . . . present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating specific facts showing a genuine issue for trial." *Lamar v. Wells Fargo Bank*, 597 F. App'x 555, 557 (11th Cir. 2014) (per curiam) (first citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); and then citing *Celotex Corp.*, 477 U.S. at 324). "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." M.D. Ga. L.R. 56; *see Mason v. George*, 24 F. Supp. 3d 1254, 1260 (M.D. Ga. 2014).

# FACTUAL BACKGROUND

Defendant MillerCoors operates a brewery in Albany, Georgia.[2] (*See* Doc. 25-3 at 11). Plaintiff, a Black woman, began working as a filler operator in the MillerCoors packaging department in June 2016. (Doc. 25-1 ¶ 5; Doc. 25-3 at 2; Doc. 27-1 ¶ 5). The packaging department is responsible for injecting beer into containers such as bottles, cans, and kegs. (Doc. 25-1 ¶ 7; Doc. 27-1 ¶ 7). In Plaintiff's role, she primarily operated the filler—the machine that "put the beer in the can and sealed it up"—and was generally responsible for ensuring the filler ran properly. (Doc. 27-2 at 35:1–9, 36:14–18).

Plaintiff was a dues-paying union member during her time at MillerCoors. (Doc. 27-2 at 27:12–15). Under the collective bargaining agreement between Defendant and the union, Defendant could discipline or discharge employees only for "good cause." (Doc. 25-3 at 7). Additionally, the collective bargaining agreement stated that Defendant could not base any disciplinary action on any other disciplinary action that had occurred "more than 18 months prior." (Doc. 27-2 at 48:13:13–16; Doc. 25-3 at 8). Plaintiff's claims stem from two disciplinary incidents while she was employed with Defendant: a five-day suspension in November 2018 and her termination in July 2019.

## I. November 2018 Suspension

On November 26, 2018, Plaintiff was operating the filler and needed to "change-over" the filler to accommodate eight-ounce cans instead of ten-ounce cans. (Doc. 25-1 ¶¶ 23–23(a); Doc. 27-1 ¶¶ 23–23(a)). The process, which occurs three to four times weekly, requires the filler operator to change the filler's vent tubes while the line is shut down. (Doc. 25-1 ¶ 10; Doc. 27-1 ¶ 10). During the pre-shift meeting on November 26, 2018, Marty Rentz, the acting line lead, told Jeff Moye, one of Plaintiff's coworkers, to help her change the vent tubes "to expedite the process." (Doc. 25-1 ¶ 23(a); Doc. 27-1 ¶ 23(a)). Moye had assisted Plaintiff with changing vent tubes on previous occasions. (Doc. 27-2 at 87:17–20). On this occasion, however, Plaintiff told Moye she did

---

[2] The Court derives the relevant facts from Defendant's Statement of Material Facts (Doc. 25-1), Plaintiff's response thereto (Doc. 27-1), and the record. When evaluating the Motion for Summary Judgment, the Court construes the facts in the light most favorable to Plaintiff, the nonmoving party. *See* Fed. R. Civ. P. 56; *Jacoby v. Baldwin County*, 835 F.3d 1338, 1342 (11th Cir. 2016) (citations omitted).

not need his help. (Doc. 25-1 ¶ 23(d); Doc. 27-1 ¶ 23(d)). Plaintiff testified that, in addition to Moye, Rentz told Jill Hunter, another filler operator, to help Plaintiff with the change-over. (Doc. 27-2 at 85:6–9). Plaintiff testified that she told Moye she did not need help because she thought there were too many people "up there at the filler," creating a safety issue. (*Id.* at 86:3–10). She further testified that she thought changing "the vent tubes [was] a one-person job." (*Id.* at 88:24–89:4).

About two hours later, Rentz realized that the vent-tube change-over was behind schedule and that Moye was not helping Plaintiff. (Doc. 25-1 ¶ 23(e); Doc. 27-1 ¶ 23(e)). Rentz again told Moye to assist Plaintiff, and Plaintiff again told Moye that she did not need help. (Doc. 25-1 ¶ 23(f); Doc. 27-1 ¶ 23(f)). Rentz questioned Plaintiff about why she refused Moye's help, and she responded that having someone help her would be unsafe. (Doc. 25-1¶ 23(g); Doc. 27-1 ¶ 23(g)). Rentz replied that there was no safety issue with someone helping Plaintiff. (Doc. 25-1 ¶ 23(g); Doc. 27-1 ¶ 23(g)). Plaintiff "continued to refuse" Moye's help, and Rentz instructed her to leave the filler and go into a separate room to discuss the dispute with a union steward present. (Doc. 25-1 ¶ 23(h); Doc. 27-1 ¶ 23(h)).

Richard Stone, Rentz's supervisor, and Michael Henderson, a union steward, attended the meeting with Plaintiff and Rentz. (Doc. 25-1 ¶ 23(k); Doc. 27-1 ¶ 23(k)). During the meeting, Stone asked Plaintiff to explain the situation. (Doc. 25-1 ¶ 23(l); Doc. 27-2 at 60:10–15). Plaintiff said she believed there were too many people around the filler during the change-over, causing a safety issue. (Doc. 25-1 ¶ 23(l); Doc. 27-2 at 61:8–11). At some point, Stone yelled at Plaintiff and told her that "he didn't want to hear [anymore]." (Doc. 25-3 at 19; Doc. 27-2 at 62:3–6). Plaintiff tried to leave the meeting, but Rentz blocked the door. (Doc. 25-3 at 19; Doc. 27-2 at 62:15–18). Stone then directed Rentz to let Plaintiff leave so that she could return to the filler. (Doc. 25-1 ¶ 23(l)–(m); Doc. 27-2 at 63:9–13).

Instead of returning to the filler, Plaintiff went to the human resource (HR) department and met with Veon Williams. (Doc. 25-1 ¶ 23(n); Doc. 27-2 at 64:17–19). Williams suggested that Plaintiff apologize for the dispute, but she told him she would not because she felt "hemmed up in a room against [her] will," and believed that Rentz should

4

apologize instead. (Doc. 25-1 ¶ 23(o); Doc. 27-2 at 67:8–16). While Plaintiff was speaking with Williams, Stone found her and told her to return to the filler because she had left her lock on the machine. (Doc. 25-1 ¶ 23(p); Doc. 27-2 at 65:11–15, 66:5–12). A filler lock operates as a safety switch; and while Plaintiff's lock was on the filler, no other employee could operate it, causing the entire line to stay shut down. (Doc. 25-1 at 23(p); Doc. 27-2 at 65:17–25, 71:10–13). Eventually, Plaintiff met with the unit manager, John Hildreth, who informed her that she had violated MillerCoors' Plant Rules and sent her home. (Doc. 25-1 at 23(q); Doc. 27-2 at 69:12–70:5).

In the employee corrective action form that detailed the disciplinary action taken against Plaintiff, Defendant explained that Plaintiff was "insubordinate" by "delay[ing] the implementation of instructions" she received from "members of management," being "disrespectful" to employees "in positions of authority, fail[ing] to follow the work instructions" from "members of management, neglecting [her] duties [and] assignments, and failing to perform work to acceptable standards" in violation of Plant Rules One, Five, and Eleven.[3] (Doc. 25-3 at 16). Defendant further explained that "[a]ny future improper conduct" would "result in more severe disciplinary action, which could mean [Plaintiff's] dismissal. (*Id.*). Plaintiff disputes the basis for her suspension, arguing that she was suspended for reporting Rentz's behavior to HR rather than for violating plant rules. (*See* Doc. 27-2 at 73:2–6).

## II.   July 2019 Termination

On July 4, 2019, Lisa Willis-Tatta, a white female employee, arrived for her shift, which was just after Plaintiff's shift on the filler. (Doc. 25-1 ¶¶ 5, 25; Doc. 27-1 ¶¶ 5, 25). Willis-Tatta saw trash on the floor around the filler and discovered that the trash cans in

---

[3]   Plaintiff objects to consideration of the fact that Defendant issued an employee corrective action. Plaintiff argues that this fact is inadmissible character evidence that violates Federal Rules of Evidence 404 and 406. (Doc. 27-1 ¶ 22). Plaintiff makes similar objections to evidence submitted regarding her performance at work. (*See id.* ¶¶ 15–16). At summary judgment, the Court may consider character evidence if it can be reduced to admissible form at trial. *See* Fed. R. Civ. P. 56(c)(2); *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1207 (11th Cir. 2013). Not only are the facts about Plaintiff's work performance arguably not inadmissible character evidence, Defendant can lay a foundation to properly admit this evidence as evidence of its nondiscriminatory intent.

the area had not been taken out during the previous shift. (Doc. 25-1 ¶ 25; Doc. 27-1 ¶ 25). Willis-Tatta reported the condition of the filler area, and Katherine Harpe, a packaging department supervisor, asked for pictures of the trash. (Doc. 25-1 ¶¶ 25, 53; Doc. 27-1 ¶¶ 25, 53). Willis-Tatta provided the requested photographs, and Harpe told Plaintiff about the photographs the following day. (Doc. 25-1 ¶ 26; Doc. 27-1 ¶ 26; *see* Doc. 25-3 at 39–43). In response, Plaintiff explained to Harpe why she left trash around the filler and requested a meeting with Willis-Tatta to provide her with an explanation as well. (Doc. 27-2 at 100:10–25).

Later that evening, while Plaintiff was still on the clock, she left her workstation at the filler to find Willis-Tatta and "talk to her about the pictures." (Doc. 27-2 at 101:25–102:6, 104:19–21; Doc. 25-1 ¶ 28; Doc. 27-1 ¶ 28). MillerCoors Plant Rule Eleven says that employees must obtain "prior and proper supervisory approval" before leaving their "assigned work area or entering another work area," but Plaintiff did not obtain her supervisor's permission to leave her workstation. (Doc. 25-3 at 15; Doc. 27-2 at 103:12–14). Plaintiff was aware of Rule Eleven but testified that other employees left the filler to go elsewhere "all the time." (Doc. 27-2 at 102:21–23, 103:8–18).

Plaintiff found Willis-Tatta in a team room talking with other MillerCoors employees. (Doc. 25-1 ¶ 28; Doc. 27-1 at 103:6–11). Plaintiff said to Willis-Tatta, "it doesn't matter how many times you send pictures, it's not going to change the way I do my job." (Doc. 27-2 at 106:5–8; Doc. 25-1 ¶ 28; Doc. 27-1 ¶ 28). Willis-Tatta then told Plaintiff "to get the f*** out of [her] face." (Doc. 25-1 ¶ 29; Doc. 27-1 ¶ 29; Doc. 27-2 at 106:15–17). Ms. Willis-Tatta left the team room, and Plaintiff stayed to talk with the other employees there. (Doc. 25-1 ¶ 29; Doc. 27-1 ¶ 29; Doc. 27-2 at 109:18–25). After a few minutes, however, Plaintiff encountered Willis-Tatta in the break room. (Doc. 25-1 ¶ 30; Doc. 27-1 ¶ 30; Doc. 27-2 at 110:2–8). Plaintiff told Willis-Tatta not to curse at her again. (Doc. 25-1 ¶ 30; Doc. 27-1 ¶ 30; Doc. 27-2 at 110:12–19). Willis-Tatta then "got in [Plaintiff's] face" and asked Plaintiff what Plaintiff would do if she cursed again. (Doc. 27-2 at 110:20–21; Doc. 27-1 ¶ 30). At that point, Plaintiff said, "try me and see." (Doc. 27-1 ¶ 30; Doc. 27-2 at 107:22–24). Plaintiff testified that Willis-Tatta was acting

6

"like she wanted to fight," so Plaintiff was ready to fight as well. (Doc. 27-2 at 107:25–108:7). Plaintiff and Willis-Tatta then saw Harpe outside the breakroom, and Willis-Tatta reported that Plaintiff had threatened her. (Doc. 25-1 ¶ 31; Doc. 27-2 at 110:23–111:3, 112:1–17). Harpe told Plaintiff that she was "on notice" of possible discipline and told Willis-Tatta to go to the filler. (Doc. 25-1 ¶ 32; Doc. 27-1 ¶ 32; Doc. 27-2 at 112:18–24).

Harpe investigated the incident, which included interviewing both Willis-Tatta and Plaintiff in the presence of a union steward and obtaining written statements from both Willis-Tatta and Plaintiff. (Doc. 25-1 ¶ 34; Doc. 27-1 ¶ 34). Defendant issued a verbal warning to Willis-Tatta for "using abusive language towards another employee" in violation of Plant Rule Two. (Doc. 25-3 at 17). As part of the investigation, Sonya Carswell-Williams, a line lead, submitted a written statement saying that "she had repeatedly counseled Plaintiff that she was never to leave her work area until properly relieved." (Doc. 25-1 ¶¶ 11, 34; Doc. 27-2 ¶ 34). Defendant issued an employee corrective action form terminating Plaintiff's employment effective July 30, 2019, for violating Plant Rules Five, Eleven, and Fourteen. (Doc. 25-3 at 37). The employee corrective action form (1) explained that Plaintiff "neglected [her] duties and responsibilities" by leaving her workstation "without prior and proper supervisory approval," (2) stated that Plaintiff had "been coached on several occasions" about not leaving her assigned area without approval, and (3) noted that Plaintiff had been suspended in November 2018 for leaving her assigned work area. (*Id.*). Plaintiff filed a union grievance for unjust termination, but the union grievance committee determined that the union could not win her case in arbitration. (Doc. 25-1 ¶¶ 38–39; Doc. 25-3 at 38, 57; Doc. 27-1 ¶¶ 38–39).

## DISCUSSION

Defendant contends that it is entitled to summary judgment because Plaintiff failed to establish a prima facie case of race discrimination and because it had nondiscriminatory reasons for terminating her employment. (Doc. 25-6 at 5–14). Defendant further argues that Plaintiff failed to establish a prima facie case of retaliation. (*Id.* at 14–18). Plaintiff

7

responds that she has provided circumstantial evidence of race discrimination and retaliation such that her claims survive summary judgment. (Doc. 27 at 5–11).

**I.     Race Discrimination**

"[T]o survive summary judgment, a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in her favor." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc). The plaintiff may establish race discrimination with direct or circumstantial evidence. *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (citation omitted). The Court analyzes circumstantial evidence using the *McDonnell Douglas* framework. *Id.* (citing *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174, 1181 (11th Cir. 2010)); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under *McDonnell Douglas*, the plaintiff bears the initial burden of making a *prima facie* "case of race discrimination by demonstrating that:" (1) she is a member of a "protected class," (2) she "suffered an adverse employment action," (3) she "was qualified to perform the job in question," and (4) her "employer treated 'similarly situated' employees outside [her] class more favorably." *Jenkins*, 26 F.4th at 1249 (citing *Lewis*, 918 F.3d at 1220–21). If the plaintiff establishes "a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Lewis*, 918 F.3d at 1221 (citation omitted). Finally, if the defendant carries its burden, the plaintiff must show that the defendant's "proffered reason was merely a pretext for unlawful discrimination." *Id.* (citation omitted). The Title VII analysis, specifically the *McDonnell Douglas* burden-shifting framework, also applies to claims under 42 U.S.C. § 1981. *Lewis*, 918 F.3d at 1220 n.5 (citation omitted); *Johnson v. Miami-Dade County*, 948 F.3d 1318, 1325 (11th Cir. 2020) (per curiam) (citations omitted).

"Aside from the *McDonnell Douglas* framework, an employee can still survive summary judgment by presenting 'circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" *Jenkins v. Nell*, 26 F.4th 1243, 1251 (11th Cir. 2022) (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). To do so, the plaintiff must establish that "[a] triable issue of fact exists" by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer

8

intentional discrimination" by the employer. *Id.* (citing *Smith*, 644 F.3d at 1328). Evidence sufficient to establish a "convincing mosaic" includes "(1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." *Id.* (citing *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019)).

Plaintiff has established the first three elements of a *prima facie* case of race discrimination under the *McDonnell Douglas* framework. First, as a Black woman, she is part of a protected class. *See Tucker v. Fulton County*, 470 F. App'x 832, 835 (11th Cir. 2012). Second, her termination constituted an adverse employment action. *See Davis v. Legal Servs. of Ala., Inc.*, 19 F.4th 1261, 1266 (11th Cir. 2021) (citation omitted) (per curiam). Third, Defendant does not dispute that Plaintiff was qualified for the job at issue. (*See* Doc. 25-6 at 5–6). Thus, whether Plaintiff has established a prima facie case of race discrimination turns on the fourth *McDonnell Douglas* element: whether Defendant treated similarly situated employees outside of Plaintiff's protected class differently.

To show that similarly situated employees were treated differently, Plaintiff "must point to comparators of a different race who were 'similarly situated in all material respects' and were not subject to the same mistreatment.'" *Ziyadat v. Diamondrock Hosp. Co.*, 3 F.4th 1291, 1296 (11th Cir. 2021) (citing *Lewis*, 918 F.3d at 1229). Similarly situated in all material respects "typically means that the comparators must have engaged in the same basic conduct or misconduct, been subject to the same policy, worked under the same supervisor, and had similar work experience and disciplinary history." *Id.* (citing *Lewis*, 918 F.3d at 1227–28). Here, Plaintiff contends that she was treated differently than Willis-Tatta, a white woman in the same job that Plaintiff had at MillerCoors. (Doc. 27 at 9). Plaintiff asserts that she and Willis-Tatta "engaged in the exact same conduct" during the dispute underlying Plaintiff's termination but that "Willis-Tatta received a warning" while Plaintiff "lost her job." (*Id.* at 10).

Willis-Tatta is not a proper comparator because the misconduct for which Plaintiff was disciplined was leaving her assigned workstation without approval. There is no evidence that Willis-Tatta engaged in similar misconduct. Plaintiff asserts that she

9

encountered Willis-Tatta in the team room but does not point to anything in the record showing that Willis-Tatta was away from her workstation without approval. Thus, Plaintiff has not shown that she and Willis-Tatta were engaged in the same basic misconduct. Moreover, according to the union's collective bargaining agreement, Plaintiff's November 2018 suspension, which occurred within eighteen months of her termination in July 2019, constituted a prior disciplinary action that Defendant could consider when imposing further discipline. (*See* Doc. 25-3 at 7). Defendant asserts that Willis-Tatta did not have a disciplinary history. (Doc. 31 at 9). Plaintiff has not presented evidence that Willis-Tatta had been subject to any—let alone similar—disciplinary action before the July 2019 dispute. Accordingly, Plaintiff has failed to state a prima facie case of race discrimination.

Because "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case," the Court must determine if Plaintiff has presented "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent"—sometimes called a "convincing mosaic." *Troupe v. DeJoy*, 861 F. App'x 291, 294 (11th Cir. 2021) (per curiam) (first citing *Smith*, 644 F.3d at 1328; and then citing *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012)). Plaintiff has not presented such evidence. Rather, Plaintiff has merely offered "inference based on speculation and conjecture" that she was either terminated for retaliatory reasons or was treated less favorably than Willis-Tatta, who is white. *See id.* at 295 (citing *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013)); (Doc. 27 at 10). Plaintiff "do[es] not provide sufficient evidence to permit a reasonable jury to infer that" her race "played any role in" her termination, especially given that, on the day of the altercation, she alone was guilty of leaving her workstation without approval and she alone had a prior disciplinary action. *See Troupe*, 861 F. App'x at 295. Accordingly, Plaintiff has not presented a convincing mosaic establishing that Defendant had discriminatory intent when it terminated her employment. *See Luke v. Univ. Health Servs., Inc.*, 842 F. App'x 503, 508 (11th Cir. 2021) (explaining that the plaintiff's proffered comparators were not "similarly situated" to the plaintiff "in all material

respects" because they "did not share" her "employment or disciplinary history" (quoting *Lewis I*, 918 F.3d at 1226, 1228)). Accordingly, Plaintiff's Title VII and 42 U.S.C. § 1981 race-discrimination claims cannot survive summary judgment.

## II.     Retaliation

Retaliation claims based on circumstantial evidence are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Thomas*, 506 F.3d at 1363. To establish a prima facie retaliation claim under Title VII or 42 U.S.C. § 1981, the "plaintiff must show: (1) that [s]he engaged in statutorily protected [activity]; (2) that [s]he suffered an adverse employment action; and (3) that there is some causal relationship between the two events." *Johnson*, 948 F.3d at 1325 (citation omitted); *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009) (explaining that the retaliation standards under Title VII and § 1981 are the same (citation omitted)). If the plaintiff makes a *prima facie* case, "the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason" for its challenged action. *Johnson*, 948 F.3d at 1325 (citing *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805 (11th Cir. 1995) (per curiam)). "[I]f the defendant offers a legitimate, nondiscriminatory reason," the plaintiff must show that the defendant's proffered reason was pretextual. *Id.* (citing *Richardson*, 71 F.3d at 806)).

Plaintiff argues that she was disciplined in November 2018 for reporting harassment to the HR department and terminated in July 2019 for filing an intake questionnaire with the U.S. Equal Employment Opportunity Commission (EEOC). (Doc. 27 at 6–8). She contends that her internal reporting and EEOC actions were statutorily protected activities. (*Id.* at 6–7). Title VII's opposition clause prohibits "discrimination against an employee" for opposing "any practice" that Title VII itself forbids. *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008) (quoting 42 U.S.C. § 2000e-3(a)). Statutorily protected activities include "internal complaints" and "complaints lodged with the EEOC." *Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir. 2001) (citation omitted). To establish that she engaged in statutorily protected activity, the plaintiff must show that she had a subjective, good-faith belief that her "employer was engaged in unlawful employment practices" and that her "belief was *objectively* reasonable in light of the facts

and record presented." *Butler*, 536 F.3d at 1213 (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)).

Plaintiff fails to establish that she was engaged in statutorily protected activity by reporting harassment to the HR department in November 2018 because she does not argue that she believed Defendant was engaged in an employment practice that violated Title VII. She asserts that Rentz and Stone harassed her in the meeting regarding the change-over dispute by hitting the table, yelling, and blocking her from leaving the room. (Doc. 27 at 6). But Plaintiff fails to argue that this alleged harassment was based on race in violation of Title VII. Plaintiff's statement regarding the incident makes no reference to race. Plaintiff used the words "harassment" and "hostile environment" and stated that "[e]mployees should not have to come to work dealing with management yelling and talking to them all kinds of ways." (Doc. 25-3 at 19). A review of Plaintiff's statements given during the investigation of the incident also makes no mention of race or of Plaintiff alleging that the harassment or hostility she perceived was racially motivated. (*Id.* at 18–19). Thus, Plaintiff has presented no contemporaneous evidence that she had a good-faith belief that Defendant was engaged in an unlawful employment action when she went to HR in November 2018. The first time Plaintiff raised the issue of race was in her EEOC questionnaire, which she filed in June 2019. (*See* Doc. 27-5 ¶¶ 3–4). Given that Plaintiff never directly said or even alluded to the possibility that she believed Rentz or Stone's harassing behavior was racially motivated, it is implausible that Plaintiff reasonably believed it was. *See Little*, 103 F.3d at 960 (explaining that the plaintiff could not reasonably have believed a comment was racially motivated where she first alleged as much eight months after the fact).

Moreover, even if Plaintiff had established that she had a reasonable, subjective belief that the complained-of behavior was motivated by race, she has not presented evidence that her belief was objectively reasonable in light of the facts. Here, Plaintiff alleges only that two white males yelled during the meeting and that Stone blocked the door. (Doc. 27 at 6). She does not allege that race was otherwise at play. For example, she makes no allegations that any statements related to or bearing on race were made during the meeting, that her race was at all referenced, or even that Rentz or Stone behaved any

12

differently towards other non-white coworkers. Nor is there any evidence that would lead to an objectively reasonable belief that Plaintiff was in a racially hostile environment. To establish "'a hostile work environment,' a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Rojas v. Florida*, 285 F.3d 1339, 1344 (11th Cir. 2002) (per curiam) (citation omitted). While Rentz and Stone's behavior may have been inappropriate, it was not sufficiently severe or pervasive to alter the conditions of employment.

To the extent Plaintiff contends her suspension immediately following the incident with Rentz and Stone in November 2018 constitutes retaliation, she has failed to state a *prima facie* case. First, as discussed, Plaintiff has failed to establish that she engaged in protected activity when she met with HR following the meeting with Rentz and Stone. Moreover, Plaintiff did not have a subjectively or objectively reasonable belief that Rentz and Stone's behavior constituted a Title VII violation. Thus, the suspension was imposed prior to her first protected expression, which occurred in June 2019 when she first alleged racial harassment in her EEOC questionnaire. Actions taken before that date cannot be said to have been retaliation for the filing of the EEOC charge. *See Pipkins*, 267 F.3d at 1201.

Plaintiff finally contends that "there is at least some evidence to suggest that" Defendant terminated Plaintiff because she filed an EEOC intake questionnaire. (Doc. 27 at 6). But Plaintiff did not submit or cite any such evidence. Plaintiff submitted an affidavit in which she declared that her union steward told Parker that Plaintiff had contacted the EEOC "around June 2019." (Doc. 27-5 ¶¶ 3, 5–6). Plaintiff further asserted that her colleagues asked her about her EEOC activity, even though she had not told anyone besides her union steward about it. (*Id.* ¶¶ 7–8). Again, as discussed above, while the EEOC questionnaire is some indicia that Plaintiff had a subjective belief that the behavior she complained of violated Title VII, her belief was not objectively reasonable in light of the facts.

Even assuming that Plaintiff's EEOC activity was statutorily protected and her termination was an adverse employment action, she does not submit any evidence showing

13

a causal relationship between the EEOC activity and her termination. Plaintiff only speculates, without citation to the record, that Parker was planning to terminate Plaintiff because of her EEOC activity before the incident with Willis-Tatta occurred. (*See* Doc. 27 at 8). First, while Plaintiff declares that she complained of race discrimination when she filled out the EEOC questionnaire and that she informed Parker she had contacted the EEOC, she does not say—and there is no evidence—that she told Parker about the substance of her complaint. More importantly, there is no evidence that Plaintiff told Parker what she said in the questionnaire. Thus, Plaintiff "failed to establish that [Parker] knew that [s]he had engaged in conduct protected by Title VII." *Henderson v. FedEx Express*, 442 F. App'x 502, 507 (11th Cir. 2011) (per curiam) (citation omitted).

  Second, even if Parker knew about the substance of Plaintiff's EEOC activity in June 2019 before Plaintiff's termination in July 2019, Plaintiff still fails to establish causality. Where a party relies on temporal proximity to establish causation, "[t]he Supreme Court requires the temporal connection . . . to be 'very close.'" *Amos v. Tyson Foods, Inc.*, 153 F. App'x 637, 646 (11th Cir. 2005) (per curiam) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (per curiam)). Here, there was approximately one month between the time Plaintiff filled out the questionnaire and her termination. "Intervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action." *Henderson*, 442 F. App'x at 506 (citations omitted); *see also Gogel*, 967 F.3d at 1137 n.15 (noting that the employer's discovery of the employee's improper actions constituted "an intervening event" that "undermined the significance of any temporal proximity"). Here, Plaintiff's disciplinary incident on July 5, 2019, was an intervening act that broke any causal link between her June 2019 EEOC intake questionnaire and her July 30, 2019 termination. Absent additional evidence of causation, Plaintiff has failed to state a *prima facie* case of retaliation. Nor is there a convincing mosaic of circumstantial evidence to support her claim.

14

## CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment (Doc. 25) is **GRANTED**.

**SO ORDERED**, this 19th day of August, 2022.

<u>/s/ Leslie A. Gardner</u>
**LESLIE A. GARDNER, JUDGE**
**UNITED STATES DISTRICT COURT**